Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4841 | **DATE** | 9/14/2001 |
| **CASE TITLE** | SUSAN K. HENLY vs. ANDREW CORPORATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment is granted.

(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 17 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 48 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| LG | courtroom deputy's initials | 01 SEP 16 PM 3:54 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

SUSAN K. HENLY,  )
      Plaintiff  )
      v.  )   No. 98 C 4841
      )
ANDREW CORPORATION,  )   Judge John W. Darrah
      Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan Henly (Henly), commenced an action against defendant, Andrew Corporation (Andrew), alleging sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20000e et seq. (Title VII). Before this Court is defendant's Motion for Summary Judgment.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence is viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmovant must still come forward with evidence establishing the elements of its claim on which it bears the burden of proof at trial. As such, it must establish specific facts that show there is a genuine issue for trial. *Miller*, 203 F.3d at 1003.

In the instant case, plaintiff, proceeding *pro se*, failed to file an appropriate response to defendant's Motion for Summary Judgment. Plaintiff's response to defendant's Statement of Facts

fails to admit or deny any of the numbered paragraphs provided in defendant's Statement of Facts. Plaintiff also includes several numbered paragraphs containing similar facts as those offered by defendant but does not support the majority of these statements with citation to any record or supporting document. Therefore, all the material facts averred by defendant are deemed admitted because plaintiff failed to controvert such facts. Furthermore, only those facts that plaintiff has supported with proper record or document citation may be considered by the Court. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997); L.R. 56.1(b)(3)(B). However, although plaintiff failed to properly respond to defendant's Motion for Summary Judgment, the motion will only be granted if defendant demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

Henly began her employment with Andrew in 1989. In October 1989, a co-worker grabbed Henly and stated, "[She] didn't want to give anybody any – [She] didn't want to give anybody none." Henly screamed and asked the co-worker to put her down. (Def.'s 56.1(a)(3) Statement ¶ 9). Henly did not complain to management or human resources about the incident. Nevertheless, management learned of the incident and investigated the incident the following day. Subsequently, management made sure that Henly would not work with this co-worker and requested that she report any further incidents to human resources. Henly did not report any further incidents with this co-worker. (Id., at ¶ 10).

Sometime before Henly transferred to first shift on July 4, 1994, she received a phone call from a co-worker named Hurman. Hurman stated: "I want to F— you" and "I want to bonk you." Henly also believed that Hurman followed her home on three or four occasions. (Def.'d 56.1(a)(3)

Statement ¶ 11). Henly informed her then-supervisor, Carla Gruca (Gruca), about the phone call. Gruca initiated an investigation and took Henly to see Sandra Wilson (Wilson) of Andrew's Human Resource Department. Wilson informed Henly to report any further problems with Hurman or any other employee to human resources. Following the meeting with Wilson, Henly had no further problems with Hurman, and he was terminated shortly thereafter. (Id., at ¶ 12).

Sometime between July 1994 and the beginning of 1995, Henly's then-foreman, Dan Stout (Stout), approached Henly and a co-worker, Maria Gala (Gala), and stated, "Susan, if you give one some, you're going to have to give everyone some, and it's a long list, isn't it, Maria?" Gala responded, "Dan, do you remember when [a man and women] were having sex in the building and the man got demoted and the lady..." Other than possibly mentioning the incident to a co-worker, Henly did not complain to anyone else at Andrew about the incident. (Def.'s 56.1(a)(3) Statement ¶ 13).

On December 13, 1995, Henly received an evaluation by her then-supervisor, Al Cox (Cox). Henly received what she termed a "low evaluation". During the evaluation, Cox stated that "Susan is one of the department's highest potential employees. She could develop into a leader of her peers by applying her interpersonal skills. She has enough job knowledge to be a positive impact on those around her every day." (Def.'s 56.1(a)(3) Statement ¶ 14). In February or March 1996, Henly complained to Cox about a five-cent raise that followed her evaluation. Cox stated that "if you would just open up just a little bit more, things would get better." Henly understood that the statement was made in the context of her December 1995 evaluation. (Id., at ¶ 15). Henly complained to Roger Blaylock, Andrew's former Director of Human Resources, about Cox's remark. Blaylock told Henly that Cox should not have made the statement and that he would speak with Cox.

3

Henly had no other incidents with Cox, and he was subsequently transferred to another department. (Id., at ¶ 16).

In April 1997, Henly's regular first shift hours were from 7:00 a.m. to 3:00 p.m. On April 1, 1997, Henly worked overtime and reported to work at 5:00 a.m. (Def.'s 56.1(a)(3) Statement ¶ 17). During this overtime, first and third shifts overlapped. Henly approached Mike Martin (Martin), a third-shift employee who was in charge of tool distribution, and asked him for a gauge. In the presence of a co-worker, Carl White (White), Martin told Henly "to be on the look-out, that he was going to take [her] and molest [her]." Alvin Hunter (Hunter), a third-shift employee, was in the area but did not hear any of Henly and Martin's conversation. (Id., at ¶ 18). Following the incident, Henly's former supervisor, Gruca, noticed Henly crying and asked her what was wrong. Henly told Gruca about the incident with Martin and that she was on her way to the police station. Gruca took Henly into her office and called Henly's then-supervisor, Kerri Perkins (Perkins). (Id, at ¶ 19)

Perkins escorted Henly to Tim Dee, a Human Resource generalist at Andrew. Henly described the incident with Martin to Dee. Dee told Henly to go home for as much time as she wanted and that the company would investigate her complaint. (Def.'s 56.1(a)(3) Statement ¶ 20).

The next day, Dee and Perkins began investigating Henly's complaint. Dee and Perkins interviewed Martin, White, and Hunter. Martin stated that he and White had seen Henly that morning because she was looking for a tool but denied making the alleged statement to Henly. White also stated that he saw Henly when she was looking for a tool and denied hearing Martin make any offensive remarks to Henly. Hunter stated that he did not hear any of the conversation between Henly and Martin. (Def.'s 56.1(a)(3) Statement ¶ 21). The next day, Dee and Perkins again

4

interviewed White. White's account did not change. Dee and Perkins ended the investigation because they had no more witnesses to interview. (Id., at ¶ 22).

On April 4, 1997, Henly returned to work. That day, Perkins and Dee met with Henly to discuss the results of their investigation. They informed Henly that they had spoken with Martin, White, and Hunter and that Martin denied making the statements and that no other witnesses could confirm the statements had been made. Dee and Perkins also informed Henly that they would make sure that she had no further contact with Martin because Martin would be moved to a different part of the building on third-shift, and Henly would continue to work in her area on first shift. Perkins also told Henly that she could begin a few minutes after the start of her shift to make sure that she did not run into third-shift employees. Henly agreed to the plan and did not ask for any type of transfer or for counseling. (Def.'s 56.1(a)(3) Statement ¶ 23).

Following the meeting with Dee and Perkins, Henly never talked or worked with Martin again. However, when Henly did work overtime, Henly had to go past Martin; and he would stand on a wooden crate and stare at her. Henly never complained to management about Martin staring at her. On April 18, 1997, Martin was terminated for absenteeism. Henly had no further contact with Martin after his termination. (Def.'s 56.1(a) Statement ¶ 25).

On June 2, 1997, Paul Skwiat (Skwiat), Perkins' immediate supervisor, met with Henly to give her a verbal warning for failing to follow specific instructions with regard to a cable assembly. Henly disagreed with the warning, claiming that Frank O'Brien, an engineer, had told her that the cable she assembled was acceptable. (Def.'a 56.1(a)(3) Statement ¶ 26). Skwiat informed Henly that the warning would still be placed in her file. Henly told Skwiat that she did not feel that the warning should stay in her file and that she terminated her employment with Andrew. She "told Mr.

5

Skwiat that here is my badges, and I terminated myself." Skwiat asked Henly why she was quitting, and she told him that she "was tired of being pinned to the cross and being crucified." No one asked Henly to resign or threatened her with termination. (Id., at ¶ 27).

Following her resignation, Henly completed an exit interview form. Henly responded on the form that she was leaving because she "should have received some type of therapist [sic] after the 4/2/97 case. Now I am." She further stated that Skwiat was "a fair person" and that she would work at Andrew again because "I enjoy my work". She described the working conditions at Andrew as "very good" and concluded that she had "nothing bad to say about Andrew Corp. I act fasted [sic] and should have received therapist [sic] after the sex harassment 4/2/97. I just thought the way I feel would go away. I now have a family therapist." (Def.'s 56.1(a)(3) Statement ¶ 28).

At all relevant times, Andrew maintained a written sexual harassment policy. The policy was posted on bulletin boards throughout the company, was available in the Human Resources Department, and was contained in the employee handbook. (Def.'s 56.1(a)(3) Statement ¶ 5). Andrew also had an Employee Assistance Program (EAP) that was available to employees who needed counseling or assistance with personal or emotional problems. Notices regarding the EAP were posted on bulletin boards throughout the company, and pamphlets describing the program were available in the Human Resources Department. (Def.'s 56.1(a)(3) Statement ¶ 6).

Henly received a copy of the employee handbook but did not recall reading Andrew's sexual harassment policy. Henly was aware that Andrew had an "open door" policy through which she could raise complaints of sexual harassment to human resources. (Def.'s 56.1(a)(3) Statement ¶ 7).

On August 14, 1997, Henly filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that she had been "continuously subjected to sexual

6

harassment", identifying the five incidents described above. (Def.'s 56.1(a)(3) Statement ¶ 8).

I. Statute of Limitations

Defendant argues that the first four alleged incidents are time barred.

In Illinois, a complainant must file a charge with the EEOC within 300 days of the alleged discriminatory act, and failure to do so renders the charges untimely. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999) (*Filipovic*). In the instant case, plaintiff filed a charge with the EEOC on August 14, 1997. The applicable limitations for plaintiff's Title VII claim is 300 days from the time of filing the EEOC charge. Therefore, only the alleged harassment by Martin falls within the statute of limitations period. Plaintiff argues that other incidents should still be considered by the Court.

The statute of limitations period may be tolled in Title VII suits through the continuing violation doctrine, equitable tolling, and equitable estoppel.

The continuing violation doctrine allows a complainant to obtain relief for a time-barred act of discrimination by linking it with facts that fall within the statutory limitations period. *See Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) (*Selan*). Three factors are considered in determining whether the series of acts should be treated as one continuous act ending within the limitations period: (1) whether the acts involve the same subject matter, (2) the frequency at which they occur, and (3) the degree of permanence of the alleged acts of discrimination, "which should trigger an employee's awareness of and duty to assert his or her rights." *Selan*, 969 F.2d at 564-65. Acts of sexual harassment that are discrete in time or circumstance in that they do not reinforce each other are not reasonably linked together into a single chain or single course of conduct. *Galloway v. General Motors Serv. Parts Oper.*, 78 F.3d 1164, 1166 (7th Cir. 1996).

7

In the present case, plaintiff alleges that she was grabbed and asked about "giving anybody any" by a co-worker in October 1989. This was the only incident with this co-worker. Almost five years later, she received a phone call from a different co-worker of a sexual nature. In addition, she alleges the co-worker followed her home on three or four occasions. After reporting the problem to Andrew, no other incidents occurred with this co-worker. Sometime within the next six to eight months, Henly's foreman made a sexual comment to Henly. Henly did not report the comment to Human Resources. Approximately a year later, Henly's supervisor stated that she needed to "open up" when discussing her recent evaluation and raise. No other incidents occurred with this supervisor. Over a year later, the incident occurred with co-worker Martin. In this incident, Martin threatened to molest Henly and stared at her several times after the threat was made.

The above five incidents occurred over an eight-year period by different individuals and are separated by months and/or years. While the five incidents all included an alleged sexual comment, nothing in the comments or the individuals who made the comments are linked together in any manner. The alleged incidents are discrete in both time and circumstance in that they do not reinforce each other and are not reasonably linked together to form a single chain or course of conduct. Accordingly, the continuing violation doctrine cannot be applied.

Equitable tolling tolls the statute of limitations if, despite all due diligence, the plaintiff is unable to obtain vital information bearing on the existence of plaintiff's claim. *Wheeldon v. Monon Corp.*, 946 F.3d 533, 536 (7th Cir. 1991) (*Wheeldon*).

Here, Henly has not provided any evidence that she was unable to obtain vital information bearing on the existence of her claim or that she was unable to learn of the EEOC's filing requirements through the exercise of due diligence. Henly knew the conduct she was exposed to

beginning in 1989 was inappropriate and knew that she should inform her employer of such misconduct. As Henly has not shown any reason why she could not have learned of the EEOC's filing deadlines through the exercise of due diligence, equitable estoppel is not appropriate in this case. *See Wheeldon*, 946 F.3d at 537.

Equitable estoppel tolls the statute of limitations where an employee's untimely filing is the result of a deliberate design by the employer and plaintiff's actual and reasonable reliance of the employer's misconduct. *Wheeler*, 946 F.3d at 537. To prove estoppel successfully, the plaintiff must show that the defendant's conduct was improper, and that the plaintiff was harmed by such misconduct.

In the present case, there are no allegations or facts establishing that Andrew's engaged in any type of misconduct that caused Henly to wait to file her claim to the EEOC. Accordingly, Henly cannot rely on equitable estoppel, and the incidents occurring from 1989 through 1995 are time barred.

II. Sexual Harassment Claim

Sexual harassment is actionable under Title VII only when it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986), quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) *(Faragher)*. Whether the alleged harassment rises to this level depends on consideration of several factors, including "the frequency of the discriminatory conduct; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (*Hostetler*). There is no "magic number" of incidents needed to establish a hostile environment. Even one act of harassment is sufficient if it is egregious. *Hostetler*, 218 F.3d at 808.

Here, Martin allegedly told Henly that she should "be on the look-out, that he was going to take [her] and molest [her]." Henly also alleges that Martin subsequently stared at her on a few occasions when she worked overtime. Henly does not indicate the number of times Martin stared at her; however, Martin's employment at Andrew was terminated within two weeks of Henly's return to work.

Drawing the line that separates merely vulgar and mildly offensive from the deeply offensive and sexual harassing is not always easy. *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430 (7th Cir.1995) (*Baskerville*). On one side of the line is deeply offensive behavior, such as sexual assaults, uninvited sexual solicitations, or intimidating words or acts. On the other side of the line is the "occasional vulgar banter". *Baskerville*, 50 F.3d at 430.

However, this Court "need not decide whether particular conduct or comments crossed the line" because there must also be a basis for employer liability. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997). Employers become liable for the harassment of a co-worker only when they "know or should know that wrongdoing is a foot and yet fail to take steps reasonably designed to stop it." *Hostetler*, 218 F.3d at 811. An employer will not be liable for a co-worker's harassment of another employee if the employer responds with appropriate remedial action that is reasonably likely under the circumstances to prevent the conduct from reoccurring. *Tutman v.*

10

*WBBM-TV, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000) (*Tutman*).

In the instant case, the day that Andrew became aware of the possible harassment, Andrew sent Henly home and initiated an investigation the next day. Although the investigation did not result in conclusive evidence that the alleged statement was made by Martin, Andrew made sure that Henly worked a different shift than Henly and that Martin worked in a different area than Henly. In addition, Henly was allowed to start her work day later than the normal start time to help assure that Henly and Martin did not have contact. Andrew also informed Henly to report any further incidents to Human Resources. Henly reported no further incidents. These facts establish that Andrew took appropriate remedial action that was likely to prevent reoccurrence of such harassment, and summary judgment on the Title VII claim is appropriate. *See Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (finding relocation of harasser to a different floor than the plaintiff constituted effective remedial action likely to prevent reoccurrence of harassment). Accordingly, defendant's Motion for Summary Judgment as to Henly's sexual harassment claim is granted.

III. Constructive Discharge Claim

To establish a constructive discharge claim under Title VII, a plaintiff must prove that her working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced to resign. *Tutman*, 209 F.3d at 1050. The working conditions for a constructive discharge claim must be even more egregious than the high standard for a hostile work environment claim because, ordinarily, an employee is expected to remain employed while seeking redress of her claim. *Tutman*, 209 F.3d at 1050.

Here, plaintiff alleged that Martin threatened to molest her and stared at her on a few occasions. Such conduct, if it occurred, does not rise to one in which a reasonable person would

11

have feared Martin as a result of his single threat such that Henly would be forced to resign. *See Tutman*, 209 F.3d at 1050 (single oblique death threat did not constitute working conditions so intolerable to prove a constructive discharge claim).

Most significantly, it is undisputed that at the time that Henly resigned from Andrew, Martin had not been an employee at Andrew for almost two months. In addition, Henly's statements in her exit interview form, in which Henly stated that the working conditions at Andrew were "very good" and that she had "nothing bad to say about Andrew", fail to support the proposition that her working conditions were so intolerable that she was forced to resign and actually raise a contrary inference. *See Ross v. Matthews Employment*, 2000 WL 1644584 (N.D.Ill. Oct. 27, 2000) (denying constructive discharge claim where the letter submitted by plaintiff when she resigned indicated her departure was amicable). Accordingly, summary judgment as to Henly's constructive discharge claim is appropriate.

For the reasons set forth above, defendant's Motion for Summary Judgment is granted.

Dated: September 14, 2001

JOHN W. DARRAH
United States District Judge